8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11                          ----oo0oo----

12   SHASTA LINEN SUPPLY, INC., on      CIV. NO. 2:16-00158 WBS AC
     behalf of themselves and all
13   others similarly situated,

14              Plaintiffs,

15       v.

16   APPLIED UNDERWRITERS, INC.;
     APPLIED UNDERWRITERS CAPTIVE
17   RISK ASSURANCE COMPANY, INC.;
     CALIFORNIA INSURANCE COMPANY;
18   and APPLIED RISK SERVICES,
     INC.,
19
                Defendants.
20

21   PET FOOD EXPRESS LTD., and
     ALPHA POLISHING, INC. d/b/a
22   GENERAL PLATING CO., on
     behalf of themselves and all
23   others similarly                   CIV. NO. 2:16-01211 WBS AC
     situated,
24                                       MEMORANDUM AND ORDER RE:
                Plaintiffs,              DEFENDANTS' MOTION TO DISMISS
25
         v.
26
     APPLIED UNDERWRITERS, INC.;
27   APPLIED UNDERWRITERS CAPTIVE
     RISK ASSURANCE COMPANY, INC.;
28   CALIFORNIA INSURANCE COMPANY;

                              1

and APPLIED RISK SERVICES, INC.,

Defendants.

----oo0oo----

Plaintiffs Shasta Linen Supply, ("Shasta"); Pet Food Express, Ltd. ("Pet Food"); and Alpha Polishing[1] (collectively "plaintiffs") initiated these actions[2] against Applied Underwriters Inc. ("AU"); Applied Underwriters Captive Risk Assurance Company, Inc. ("AUCRA"); Applied Risk Services, Inc. ("ARS"); and California Insurance Company, Inc. ("CIC") (collectively "defendants")[3] alleging that defendants fraudulently marketed and sold a workers' compensation insurance program to them and other employers in violation of California and federal law. Before the court is defendants' Motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Mot. to Dismiss (Docket No. 62).)

I.    Factual and Procedural Background

California requires that all employers purchase workers' compensation insurance coverage for employees that

---

[1]    The amended complaint in the Pet Food action added Alpha Polishing, Inc., as a new plaintiff.

[2]    On July 6, 2017, the court entered an order consolidating the actions for pre-trial purposes. (Shasta Docket 2:16-158 No. 59; Pet Food Docket 2:16-1211 No. 58.)

[3]    AU is the parent company of AUCRA and ARS, and controls CIC through another subsidiary. (SSAC ¶ 8, Ex. A, Ins. Comm'r's June 20 Decision & Order ("Comm'r's Order") at 9-10 (Shasta Docket No. 56-1).

2

suffer injury or death due to an occupational accident.  (Shasta Second Amended Compl. ("SSAC") ¶ 3 (Shasta Docket No. 56); Pet Food Amended Compl. ("PFAC") ¶ 3 (Pet Food Docket No. 54).)  The California Insurance Code also requires that all workers' compensation insurance policy forms, rates, and rating plans be filed for approval with the California Workers Compensation Insurance Rating Bureau ("the Bureau") and approved by the California Department of Insurance.  (SSAC ¶ 22; PFAC ¶ 23; see also California Insurance Code §§ 11658, 11735.)

Defendants allegedly marketed and sold a workers' compensation insurance program under the names EquityComp and SolutionOne (collectively "the program") to plaintiffs and other California employers.  (SSAC ¶ 29; PFAC ¶ 30.)  Defendants filed this policy with the Bureau and got approval from the Department of Insurance.  (SSAC ¶ 30; PFAC ¶ 31.)  After the program's policies took effect for the plaintiffs, defendants allegedly required plaintiffs to sign a Reinsurance Participation Agreement ("RPA").  (SSAC ¶¶ 28, 43; PFAC ¶¶ 29, 44.)

Plaintiffs allege that the RPA modified the terms of the existing insurance policies, including the rates, causing plaintiffs to incur significantly higher costs for the insurance program than defendants had marketed.  (SSAC ¶ 70; PFAC ¶ 74.)  Plaintiffs claim that defendants used the RPA to charge excessive rates and additional fees to plaintiffs and other program participants.  Plaintiffs also allege that defendants deliberately misrepresented the costs of the program in their marketing materials to induce plaintiffs to rely on those costs and enter the program.  (SSAC ¶¶ 2, 5, 7; PFAC ¶¶ 2, 5, 7.)

Additionally, plaintiffs claim that the RPA's rates are void because, among other things, defendants did not file the rates with the Commissioner of the California Department of Insurance ("the Commissioner") as required by California Insurance Code § 11735.[4]  (SSAC ¶ 38; PFAC ¶ 39.)  Defendants concede the RPA was not filed or approved by the Department of Insurance prior to its use.  (SSAC ¶¶ 28, 34; PFAC ¶¶ 29, 35.)

On August 29, 2014, Shasta filed an administrative appeal with the California Department of Insurance, challenging, among other things, the legality of the RPA.  (SSAC ¶ 8, Ex. A, Comm'r's Order.)  Shasta argued that the RPA was void as a matter of law because defendants did not file the RPA with the Commissioner thirty days prior to when it was to take effect, as required by § 11735.  (Id. at 2.)

On January 26, 2016, Shasta brought an action in this court alleging fraud and unfair competition against defendants for their marketing and sale of the insurance program and RPA.  (Shasta Compl. (Shasta Docket No. 1).)  With respect to the RPA, Shasta again argued that the RPA was void because defendants did not file it with the Commissioner prior to it taking effect, thereby violating § 11735.  (Id. ¶ 3.)  Shasta argued that billing plaintiff under the void RPA constituted fraud and was an unfair business practice.  (Id. ¶ 4.)  Defendants moved to dismiss the complaint to the extent it relied on § 11735, arguing that a rate is legal unless and until the Commissioner holds a hearing and disapproves the rate, pursuant to § 11737.  (Defs.'

_____
    [4]  All statutes referenced are from the California Insurance Code unless stated otherwise.

June 13, 2016 Mot. to Dismiss at 6 (Shasta Docket No. 17).)

On June 20, 2016, the court granted defendants' motion to dismiss to the extent Shasta relied on § 11735, stating that "a rate that has not been filed as required by § 11735 is not an unlawful rate unless and until the Commissioner conducts a hearing and disapproves the rate." (June 20, 2016 Order ("June 20 Order") at 4 (Shasta Docket No. 30).) Because Shasta had not alleged that the Commissioner had held a hearing and disapproved the RPA, the court concluded that plaintiff did not plausibly allege that the RPA was void. (Id.)

On the same day as the court's order of dismissal, the Commissioner issued a Decision and Order in Shasta's administrative case, holding that the RPA must be filed and approved by the Commissioner pursuant to § 11735 before use. (SSAC ¶ 8, Ex. A, Comm'r's Order.) Because defendants did not file the RPA before it took effect, the Commissioner stated, the "RPA is void as a matter of law." (Id.) Based on the Commissioner's Order, Shasta filed a motion for reconsideration of the June 20 Order granting the motion to dismiss. (Shasta Docket No. 33.) The court denied Shasta's motion for reconsideration, holding that the Commissioner's Order did not control this court and that the court's previous June 20 Order was not clearly erroneous. (Mem. and Order Re: Mot. for Recons. (Shasta Docket No. 47).)

Pet Food filed a separate class action against defendants in state court asserting claims for unfair competition, rescission, declaratory relief, and fraud. The action was removed to federal court on March 29, 2016. (Pet Food

5

1    Docket No. 1.)  Defendants, as they had in the Shasta case, moved

2    to dismiss the Pet Food complaint to the extent it sought to

3    invalidate the RPA on the ground that it is an unfiled rate or

4    rating plan in violation of § 11735.  (Pet Food Docket No. 15.)

5    The court denied defendants' motion to dismiss as moot because

6    Pet Foot's complaint did not rely on § 11735.  (Order Re: Mot. to

7    Dismiss (Pet Food Docket No. 35).)

8         On June 21, 2017, the plaintiffs in both actions filed

9    amended complaints that are nearly identical.  The complaints

10   assert claims under the federal Racketeer Influence Corrupt

11   Organizations ("RICO") statue, 18 U.S.C. § 1962; under the

12   California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code

13   § 17200; and for unjust enrichment.

14   II.   Legal Standard

15        On a Rule 12(b)(6) motion, the inquiry before the court

16   is whether, accepting the allegations in the complaint as true

17   and drawing all reasonable inferences in the plaintiff's favor,

18   the plaintiff has stated a claim to relief that is plausible on

19   its face.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "The

20   plausibility standard is not akin to a 'probability requirement,'

21   but it asks for more than a sheer possibility that a defendant

22   has acted unlawfully."  Id.  "A claim has facial plausibility

23   when the plaintiff pleads factual content that allows the court

24   to draw the reasonable inference that the defendant is liable for

25   the misconduct alleged."  Id.  Under this standard, "a well-

26   pleaded complaint may proceed even if it strikes a savvy judge

27   that actual proof of those facts is improbable."  Bell Atl. Corp.

28   v. Twombly, 550 U.S. 544, 556 (2007).

III.  Discussion

     A.  Racketeer Influenced and Corrupt Organizations Claim

          To state a RICO claim, plaintiffs must allege (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity or collection of unlawful debt.  18 U.S.C. § 1962(c).  In addition, the conduct must be the proximate cause of harm to the victim.  Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992).  Defendants' motion only challenges whether the complaints (1) sufficiently plead an enterprise and (2) allege a specific intent to defraud as required to plead mail and wire fraud as "racketeering activity."

          1.  Enterprise

          Pursuant to RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in. . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  It may include "a group of persons associated together for a common purpose of engaging in a course of conduct."  United States v. Turkette, 452 U.S. 576, 583 (1981).

          To establish liability under § 1962(c), the plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the

same 'person' referred to by a different name." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 161 (2001). Plaintiffs define their enterprise, known as the AU RPA Enterprise, as an "association-in-fact." Defendants do not challenge whether the AU RPA Enterprise, as pled, satisfies the elements of an associated-in-fact enterprise, but instead question whether plaintiffs have been able to sufficiently allege distinctiveness between the RICO persons and the enterprise.

The "enterprise" at issue consists of the four corporate defendants themselves and five individuals associated with those companies. (SSAC ¶ 73; PFAC ¶ 77.) A plaintiff may name all members of an associated-in-fact enterprise as individual RICO persons, <u>River City Mkts., Inc. v. Fleming Foods W., Inc.</u>, 960 F.2d 1458, 1461-62 (9th Cir. 1992), but must establish that those individual members are "separate and distinct" from the enterprise they collectively form, <u>Living Designs, Inc. v. E.I. Dupont de Nemours & Co.</u>, 431 F. 3d 353, 361 (9th Cir. 2005).

Defendants argue that the companies are essentially indistinguishable from one another, and thus they cannot form an enterprise that is distinct from the corporations themselves. (Defs.' Mem. of P. & A. at 17.) However, that the four corporations are named as defendants and RICO persons does not necessarily mean that a distinct RICO enterprise has not been alleged. Plaintiffs allege that the corporations came together for the purpose of conducting the affairs of the AU RPA Enterprise, thereby creating an enterprise that exists separately from the businesses of the four companies. (Pls.' Mem. of P. &

A. at 16.)

The Ninth Circuit has indicated that an enterprise consisting of related but legally distinct entities likely does satisfy the distinctiveness requirement.  Sever v. Alaska Pulp Corp., 978 F. 2d 1529, 1534 (9th Cir. 1992) (when determining whether these entities are distinct, "the only important thing is that [the enterprise] be either formally. . . or practically. . . separable from the individual." (citations omitted)).  Here, while the companies may not be practically separate, they have maintained their formal, legal separation.

However, the Ninth Circuit has not explicitly addressed whether legal separation is sufficient to satisfy the distinctiveness requirement, and district courts within the circuit remain split on the question of what is required to show distinctness.  Some courts conclude that "the formal, legal separation of the defendant entities satisfies the RICO distinctiveness requirement."  Waldrup v. Countrywide Fin. Corp., Civ. No. 2:13-8833 CAS, WL 93363, at *7 (C.D. Cal. Jan. 5, 2015); see also Monterey Bay Military Hous., LLC v. Pinnacle Monterey LLC, 116 F. Supp. 3d 1010, 1046 (N.D. Cal. 2015), order vacated in part on reconsideration on other grounds, Civ. No. 14-3953 BLF, WL 4624678 (N.D. Cal. Aug. 3, 2015) ("Defendants cannot shed their other corporate distinctions when it suits them, particularly where it is alleged that the separate corporate entities were critical in carrying out the racketeering activity."); Negrete v. Allianz Life Ins. Co. of N. Am., 926 F. Supp. 2d 1143, 1151 (C.D. Cal. 2013) (finding that the "formal separation [of parent and subsidiary companies] is alone

sufficient to support a finding of distinctiveness").  Others

require "something more" than mere legal distinctiveness, like

different or uniquely significant roles in the enterprise.  See,

e.g., In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices

Litig., 601 F. Supp. 2d 1201 (S.D. Cal. 2009).

Here, plaintiffs have plausibly pled that each

subsidiary had a distinct role in the enterprise.[5]  (SSAC ¶ 73-

78; PFAC ¶ 77-82.)  Additionally, defendants received a patent

for the program that itself articulates how operating through

separate companies facilitated the AU Program scheme.  (SSAC ¶

37, Ex. E, "Reinsurance Participation Plan," Patent No. 7,908,157

B1 (Docket No. 54-5).)[6]  Accordingly, even if legal separateness

is not sufficient, the plaintiffs have been able to plead that

each of the four corporate entities played a unique role in the

enterprise, thus satisfying the "something more" standard.

Defendants further argue that an enterprise must be not

only different than the "persons" alleged to have committed the

---

[5]    In the complaints, plaintiffs state that "[d]efendants'
decision to sell the illegal workers' compensation insurance
Program as separate corporate forms, and via the AU RPA
Enterprise rather than through divisions of AU, facilitated and
made possible the unlawful activity because separating the
regulatory approval of the GC policies filed by CIC from the rest
of the AU Program, including the RPA, enabled AU to circumvent
the necessary regulatory checks-and-balances needed in
comprehensive state workers' compensation systems. . . .It also
enabled Defendants to trick employers as to the legality of the
Program being offered."  (SSAC ¶¶ 77-78; PFAC ¶¶ 81-82.)

[6]    The court may consider the patent because plaintiffs
attached it to their complaint.  See Lee v. City of Los Angeles,
250 F. 3d 668, 689 (9th Cir. 2001)(stating that a court may
consider material which is properly submitted as part of the
complaint).

RICO violation, but also different than the conduct that makes up the alleged pattern of racketeering activity.  However, the Ninth Circuit has rejected the latter requirement.  See, e.g., Odom v. Microsoft Corp., 486 F. 3d 547, 549 (9th Cir. 2007) (rejecting the obligation for a separate structure distinct from the racketeering activity).  Accordingly, plaintiffs have satisfied the distinctiveness requirement.

## 2.    Racketeering Activity

Racketeering activity is any act indictable under the several provisions of Title 18 of the United States Code, including the predicate acts alleged by plaintiffs in this case: mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. Cohen v. Trump, Civ. No. 10-940 GPC WVG, WL 690513, at *3 (S.D. Cal. Feb. 21, 2014).  The elements of mail fraud or wire fraud are: (1) the existence of a scheme to defraud; (2) the use of the mails or wires to further the scheme; and (3) a specific intent to defraud.  Eclectic Props. E., LLC v. Marcus & Millichap Co., 751 F. 3d 990, 998 (9th Cir. 2014).  The third requirement of a specific intent to deceive or defraud only needs to be alleged generally.  Odom, 486 F. 3d at 554 (explaining that "while the factual circumstances of the fraud itself must be alleged with particularity, the state of mind--or scienter--of the defendants may be alleged generally").  To satisfy this requirement, plaintiffs must first prove "the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension," and then, "by examining the scheme itself" the court may infer defendants' specific intent to defraud.  United

11

<u>States v. Green</u>, 745 F. 2d 1205, 1207 (9th Cir. 1984) (citations omitted).

Here, plaintiffs allege that defendants developed a scheme to conceal the true nature of the insurance program from regulators so that defendants could burden employers, like the plaintiffs, with oppressive and unconscionable terms. (SSAC ¶ 6; PFAC ¶ 6.) The complaints further allege that defendants misled the plaintiffs into believing the program was legal, and deceptively failed to explain how the program operated. (SSAC ¶¶ 42-55; PFAC ¶¶ 43-56.)

However, plaintiffs concede that defendants disclosed in program documents that the RPA was not a filed retrospective rating plan, and detailed how the profit sharing program would work. (SSAC ¶ 52; PFAC ¶ 53.) Additionally, defendants described in detail, in a publicly available patent, how the program would operate. As plaintiffs explain, "[d]efendants have even gone as far as to patent their planned methodology." (SSAC ¶ 36; PFAC ¶ 37.)

Moreover, while the RPA was never officially filed with the Department of Insurance, it does appear that the Department was aware of the RPA's existence. In its 2013 report, the Department explained that,

> The EquityComp product is sold with an accompanying Profit Sharing Plan through the Company's affiliate, Applied Underwriters Captive Risk Assurance, Company, Inc. (AUCRA). AUCRA then enters into a Reinsurance Participation Agreement with the insured in order to form a segregated protective cell by which the insured shares in a portion of the premiums and losses between the Company and the insured protected cell.

(Defs.' Req. for Judicial Notice in Supp. of Mot. to Dismiss, Ex. 9 (Docket No. 61-1).)[7] From this, the court cannot infer that defendants actively concealed the structure of the insurance program or the existence of the RPA from regulators, plaintiffs, or the public generally. An intent to defraud is not plausible if the allegations give rise to an "obviously alternative explanation" for the behavior. Iqbal, 556 U.S. at 679. Here, the "obvious alternative explanation" is that defendants simply did not think the RPA needed to be filed. This explanation clarifies why defendants explicitly described the insurance program's structure and the existence of the RPA in documents that were provided to plaintiffs and in a publicly available patent, and yet did not file the RPA.

The Ninth Circuit has explained that "defendants' provision of adverse information to the public by way of disclosures negates an inference that they acted with an intent to defraud." In re Worlds of Wonder Sec. Litig., 35 F. 3d 1407, 1425 (9th Cir. 1994)(citations omitted). Here, if defendants in fact knew that the RPA needed to be filed, then publicly disclosing the fact that it was unfiled would constitute adverse information. Thus, because defendants shared information regarding the RPA, including that fact that it was not filed, both directly with plaintiffs and in a publicly available patent, they have been able to refute any inference of fraud.

---

[7] The court takes judicial notice of the existence of this report, which is an official record, and the fact that these statements were made by the Department, thereby putting the Commissioner on notice as to the RPA. However, the court does not take notice of the truth of the facts asserted within the report. See Lee, 250 F. 3d at 689.

13

Accordingly, plaintiffs have not sufficiently alleged a plausible basis to infer a specific intent to defraud, and their RICO claim must be dismissed. Given the existence of the patent, even if plaintiffs were given leave to amend the court cannot see how they would be able to plead facts to create a plausible inference that defendants intended to conceal the structure of the program and thereby defraud plaintiffs.

A.    California Unfair Competition Law

1.    Standing

Plaintiffs assert a claim for injunctive relief and restitution under the UCL, Cal. Bus. & Prof. Code § 17200, et seq. Defendants argue that plaintiffs lack standing to seek either of these remedies, and thus have failed to plead a viable UCL claim. A plaintiff has Article III standing if he or she is able to show (1) that he or she has suffered an "injury in fact," (2) that the injury is "fairly traceable" to the challenged conduct, and (3) that it is "likely", as opposed to "merely speculative," that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

a.    Injunctive Relief

Plaintiffs originally requested an order enjoining defendants' allegedly unlawful business practices. (SSAC ¶ 151; PFAC ¶ 155.) [8] To establish standing to seek prospective

---

[8]    The court addresses the issue of whether plaintiffs have standing to seek an injunction because the parties briefed this topic at length. However, the court notes that at oral arguments plaintiffs stated that they were not seeking an injunction but instead wanted a declaratory judgment stating that the RPA and entire program were void. In determining whether

14

injunctive relief, plaintiff must show, in addition to the requirements listed above, that the harm suffered is "concrete and particularized" and there must be a "sufficient likelihood that [he or she] will again be wronged in a similar way." <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 111 (1983).

Defendants argue that because plaintiffs admittedly do not intend to participate in defendants' insurance program in the future, they are unable to allege a real and immediate threat of future injury. However, the purportedly unlawful RPAs that have already been issued to plaintiffs allow defendants to continue billing, collecting, and holding plaintiffs' monies well past the present date. (SSAC ¶¶ 37, 40, 55; PFAC ¶¶ 38, 41, 56.) In <u>Phillips v. Apple, Inc.</u>, the court dismissed the plaintiffs' claim for injunctive relief because they had not offered any "reason for the Court to find a likelihood of future harm." Civ. No. 15-04879 LHK, WL 1579693, at *9 (N.D. Cal. Apr. 19, 2016). However, in this case, the existence of the operative contract creates a real and immediate threat of repeated injury for the plaintiffs. Plaintiffs need not make a future purchase of defendants' program in order to be harmed in the future.

Additionally, the Consent Order and Settlement

---

plaintiffs have standing to seek declaratory relief, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>Golden v. Zwickler</u>, 394 U.S. 103, 108 (1969). Here, because the existing RPA is still being enforced, there is sufficient immediacy and reality. Accordingly, plaintiffs have standing to seek declaratory relief.

Agreement[9] settled all regulatory issues going forward. However, these documents, while they affect the defendants' ability to sell future policies, do not affect the current RPA that has been issued to plaintiffs. Defendants concede that "pursuant to the consent order, AUCRA would stop issuing new RPAs but could continue to administer and inforce RPAs." (Defs.' Mot to Dismiss 6 (Shasta Docket No. 62).) Thus, while there may be no risk of injury from future programs, plaintiffs still face a real and immediate threat of injury from the RPA that has already been issued to them. Accordingly, plaintiffs have established standing in order to seek injunctive relief.[10]

### b. Restitution

In order to have standing to seek restitution, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice." Kwikset Corp v. Super. Ct., 51 Cal. 4th 310, 322 (2011). While plaintiffs must allege that they expended money because of the defendants' acts of unfair competition, they need not prove compensable loss. Monarch Plumbing Co., Inc. v. Ranger Ins. Co., Civ. No. 2:06-1357

---

[9] The court takes judicial notice of the Consent Order and Settlement Agreement because they are public records whose existence "can be accurately and readily determined from sources whose accuracy cannot readily be questioned." See Fed. R. Civ. P. 201(b). Additionally, plaintiffs refer to the Settlement Agreement in their Amended Complaint and it forms the basis of one or more of their claims. As such, even if it were not an official record, the court could take judicial notice of it. See United States v. Ritchie, 342 F. 3d 903, 908 (9th Cir. 2003).

[10] See footnote 8.

16

WBS KJM, WL 2734391 at *6 (E.D. Cal. Sept. 25, 2006)(standing established where plaintiffs alleged injury in form of higher insurance premiums).  While plaintiffs "may ultimately be unable to prove a right to damages (or, here, restitution), that does not demonstrate that [they] lack standing to argue for [their] entitlement to them." Clayworth v. Pfizer, Inc., 49 Cal. 4th 758, 789 (2010).

Here, plaintiffs allege that "[t]he RPA, as enforced by Defendants, resulted in significant premiums, fees, charges, and/or penalties to Plaintiff[s] and Class members in excess of those advertised during the marketing of the program or that would have been paid in the absence of Defendants' wrongful conduct." (SSAC ¶ 140; PFAC ¶ 144.)  Because plaintiffs are not required to prove the specific amount they overpaid as a result of defendants' conduct at the pleading stage, plaintiffs' allegation, albeit general, is sufficient to establish standing to make a claim for restitution.

Plaintiffs may only recover the portion of the funds that defendants have retained as a result of the alleged unfair, fraudulent, or unlawful business practice.  In re Tobacco Cases II, 240 Cal. App 4th 779, 802 (4th Dist. 2015).  Here, plaintiffs are asking for exactly that--for "full restitution of all monetary sums unlawfully obtained by defendants." (SSAC ¶ 143; PFAC ¶ 147).  Restitution, "as used in the UCL, is not limited only to the return of money or property that was once in the possession of [a plaintiff]." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1149 (2003).  Rather, restitution also allows a plaintiff to recover money or property in which

plaintiff has a vested interest.  <u>Id.</u>  Plaintiffs may have an
ownership interest in "any profits [the defendant] may have
gained through interest or earnings on the plaintiffs' money that
[defendant] wrongfully held."  <u>Juarez v. Arcadia Fin., Ltd.</u>, 152
Cal. App. 4th 889, 915 (4th Dist. 2007).  Here, plaintiffs are
seeking disgorgement of profits earned by defendants as a result
of their alleged unlawful collection and retention of monies.
Because the <u>Juarez</u> court clarifies that plaintiffs may have an
ownership interest in this form of money, plaintiffs have
standing to seek restitution.

The court may, at a later stage, ultimately determine
that plaintiffs would have suffered the same harm whether or not
defendants had complied with the law, and thus find that
plaintiffs are not entitled to restitution.  However, at this
stage plaintiffs have sufficiently pled their right to
restitution.

2.  <u>Unlawful Conduct</u>

a.  <u>"Borrowing" Insurance Code § 11658</u>

The UCL forbids unlawful, unfair, and fraudulent
business practices.  (Cal. Bus. & Prof. Code § 17200.)
Plaintiffs allege that defendants violated § 11658[11] by failing to

---

[11]  Section 11658(a) states: "A workers' compensation
insurance policy or endorsement shall not be issued by an insurer
to any person in this state unless the insurer files a copy of
the form or endorsement with the rating organization pursuant to
subdivision (e) of Section 11750.3 and 30 days have expired from
the date the form or endorsement is received by the commissioner
from the rating organization without notice from the
commissioner, unless the commissioner gives written approval of
the form or endorsement prior to that time."

18

file the RPA with the Bureau or receive approval from the California Department of Insurance, thereby engaging in an unfair, unlawful, and/or fraudulent business practice. Section 11658(a) does not provide a private right of action. See Farmers Ins. Exch. v. Super. Ct., 137 Cal. App. 4th 842, 850 (2d Dist. 2006)("a statute creates a private right of action only if the statutory language or legislative history affirmatively indicates such an intent"). However, plaintiffs do not purport to state a private cause of action, but rather attempt to "borrow" § 11658(a) to satisfy the "unlawful" prong of the UCL.

The Ninth Circuit has held that a violation of a section of the California Insurance Code may be "borrowed" to make a claim under the UCL. Chabner v. United of Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000). "Virtually any law can serve as the predicate for a Business and Professions Code section 17200 action; it may be. . . civil or criminal, federal, state or municipal, statutory, regulatory, or court-made." Gafcon, Inc. v. Ponsor & Assocs., 98 Cal. App. 4th 1388, 1425 n. 15 (4th Dist. 2002). The Chabner court further clarified that "[i]t does not matter whether the underlying statute also provides for a private cause of action; section 17200 can form the basis for a private cause of action even if the predicate statute does not." 225 F.3d at 1048.

A plaintiff cannot "plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition." Id. (citations omitted). But this limit is narrow. To prevent an action under the UCL, "another provision must actually 'bar' the action or clearly permit the conduct."

19

<u>Hauk v. JP Morgan Chase Bank USA</u>, 552 F.3d 1114, 1122 (9th Cir. 2009).  Defendants cite to a number of California Court of Appeal cases in which the courts did not allow plaintiffs to borrow a violation of Insurance Code § 790 to form the basis of a UCL claim.  However, all of the cases cited by defendants occurred before <u>Chabner</u>, in which the court explicitly held that "even assuming that [previous cases] prevent causes of action based on section 790.03(f), it does not necessarily follow that they also prevent causes of action based on" other sections of the Insurance Code.  225 F.3d at 1049.  Because there is nothing that bars the borrowing of § 11658 for the purposes of a UCL claim, plaintiffs may borrow that section to use as the basis of their UCL claim.  Moreover, this court is bound by the Ninth Circuit's interpretation, which allows an Insurance Code violation to be borrowed to make a UCL claim, absent a contrary ruling by the California Supreme Court.  <u>See, e.g.</u>, <u>Johnson v. Barlow</u>, Civ. No. 06-1150 WBS GG, 2007 WL 1723617, at *3 (E.D. Cal. June 11, 2007).

> b.    <u>Sections 11375 and 11737</u>

The court previously dismissed Shasta's claims "to the extent that plaintiff seeks to invalidate the RPA on the theory that defendants violated California Insurance Code § 11735."[12] (June 20 Order at 5.)  At the time of the court's ruling, the Commissioner had not conducted a hearing and disapproved of the RPA's rates.  The court explained that using a rate that was not

---

[12]    Section 11735(a) states: "Every insurer shall file with the commissioner all rates and supplementary rate information that are to be used in this state. The rates and supplementary rate information shall be filed not later than 30 days prior to the effective date. Upon application by the filer, the commissioner may authorize an earlier effective date."

filed pursuant to "§ 11735 is not an unlawful rate unless and until the Commissioner conducts a hearing and disapproves the rate." (Id.)

The day the court issued the order, the Commissioner issued its Decision and Order, finding that defendants' RPA was in fact unfiled and therefore void as a matter of law. (Comm'r's Order.) Plaintiffs' amended complaints now re-allege the same claims the court previously dismissed, but, in light of the Commissioner's ruling, the complaints now explicitly state that the Commissioner has conducted a hearing and disapproved of the RPA under § 11735. (SSAC ¶¶ 8, 56-58; PFAC ¶¶ 8, 57-59.)

Shasta previously filed a motion for reconsideration in light of the Commissioner's Order, and this court denied the motion, holding that "the Commissioner's Order does not control this court." (Mem. and Order Re: Mot. for Recons. at 11) The Order stated that failure to file the RPA pursuant to section 11735 "renders the plan[] unlawful." (Comm'r's Order at 62). That interpretation directly conflicts with this court's June 20 Order, which held that a rate does not become unlawful unless and until the Commissioner acts to disapprove it. (June 20 Order at 4.) The court again disagrees with the Commissioner and maintains the position, as it has in previous rulings, that under section 11737, an unfiled rate is not unlawful per se.

Further, the Commissioner did not conduct a formal rate disapproval hearing pursuant to § 11737(d). In order to legally disapprove a rate, the Commissioner must first "serve notice on the insurer of the intent to disapprove and shall schedule a hearing to commence within 60 days of the date of the notice."

21

Cal. Ins. Code § 11737(d).  The Commissioner did not follow this protocol.  Even assuming the Commissioner had properly disapproved of the RPA's rates, the disapproval would be prospective only, see Cal. Ins. Code § 11737(g), and apply only to RPAs issued after June 20, 2016.  The Plaintiffs' RPAs do not fall into that category.

Plaintiffs have not successfully argued that the Commissioner's Order constituted a rate disapproval hearing within the meaning of section 11737 that rendered the RPA retroactively unlawful.  Thus, the court's reasoning for its previous dismissal remains applicable and defendants' reliance on the prior ruling is appropriate.  Accordingly, the court will again grant defendants' motion to dismiss plaintiffs' claims to the extent they seek to declare defendants' use of the RPA was illegal on the theory that defendants failed to comply with § 11735.

B.    Unjust Enrichment

California courts are divided with regard to whether unjust enrichment is a freestanding cause of action or simply a general principle that underlies various legal doctrines and remedies.  The Ninth Circuit has followed the latter approach, finding that unjust enrichment is not a freestanding cause of action.  See Bosinger v. Belnden CDT, Inc., 358 F. App'x 812, 815 (9th Cir. 2009).  However, it has since clarified that a claim for unjust enrichment may still be maintained as an independent claim for quasi-contract.  Astiana v. Hain Celestial Grp., 783 F. 3d 753, 762 (9th Cir. 2015).  A claim for quasi-contract seeking restitution is based on the theory that a defendant "has been

unjustly conferred a benefit through mistake, fraud, coercion, or request." Id.; see also Munoz v. MacMillan, 195 Cal. App. 4th 648, 661 (4th Dist. 2011) ("Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'").

Defendants argue that plaintiffs cannot plead a claim for quasi-contract because a valid express contract exists. However, "where the defendant obtained a benefit from the plaintiff by fraud, duress, conversation, or similar conduct. . . the plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory." McBride v. Boughton, 123 Cal. App. 4th 379, 388 (1st Dist. 2004).

In Astiana, the plaintiff alleged that she was entitled to relief because the defendant had "'enticed' plaintiffs to purchase their products through 'false and misleading' labeling, and that [defendant] had been unjustly enriched as a result." Astiana, 783 F.3d at 762. The Ninth Circuit held that "this straightforward statement is sufficient to state a quasi-contract cause of action." Id. Here, plaintiffs allege that "[d]efendants were unjustly enriched when they deceptively sold Plaintiffs and Class members the illegal [insurance] program and received and retained the benefits." (Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss at 25 (Docket No. 63); SSAC ¶¶ 2, 6, 10, 153-156; PFAC ¶¶ 2, 6, 10, 157-160.) As in Astiana, this statement is sufficient to state a quasi-contract cause of action. Accordingly, the court will construe plaintiffs' unjust enrichment claim as a claim for quasi-contract and deny the

motion to dismiss as to this claim.

        IT IS THEREFORE ORDERED that defendants' motion to dismiss plaintiffs' complaints be, and the same hereby is, GRANTED as to plaintiffs' RICO claims; GRANTED as to plaintiffs' attempts to invalidate the RPA on the theory that defendants violated Insurance Code section 11735; and DENIED in all other respects.

Dated:  October 17, 2017

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE